UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

MAR - 9 2006

MICHAEL N. MILBY, CLERK OF COURT

| | | |
|---|---|---|
| **DAVID THOMAS** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.: H-04-4479** |
| | § | **(JURY TRIAL DEMANDED)** |
| **WILLIE G'S POST OAK, INC., and** | § | |
| **LANDRY'S RESTAURANTS, INC.,** | § | |
| | § | |
| *Defendants.* | § | |

**DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT DISMISSING CLAIMS OF DAVID THOMAS**

1.      Defendants Willie G's Post Oak, Inc. and Landry's Restaurants, Inc. ("Defendants") file this short supplemental brief in support of their motion for summary judgment dismissing the claims of Plaintiff David Thomas ("Plaintiff"). Defendants offer this brief simply to resolve, once and for all, several issues relating to Plaintiff's termination and to demonstrate that Plaintiff's claims are meritless. In Plaintiff's Response, he argued that he had evidence that Stuart Snow ("Mr. Snow")—the supervisor who terminated Plaintiff—was "aware" of Plaintiff's sexual harassment complaints.[1]  Plaintiff also contended that he had evidence that Mr. Snow terminated him as a result of his complaint.[2]  Mr. Snow has since been deposed, and Plaintiff's assertions have been proven baseless. Mr. Snow's testimony likewise bolsters the conclusion that Plaintiff was terminated for patently legitimate reasons, to wit: yelling profanities at his direct supervisor and repeated violation of Brenner's Attendance Policy.

2.      Plaintiff brought this lawsuit against Defendants for, among other things, retaliation under Title VII of the Civil Rights Act of 1964. Plaintiff contends that the Defendants

---

[1] *See* Plaintiff's Response to Defendants' Motion for Final Summary Judgment, pg. 15.
[2] *See id.*

retaliated against him by terminating him after he complained to Brenner's corporate offices about Mr. Eric Kresse's ("Mr. Kresse") alleged sexual harassment.   However, Plaintiff was terminated by Mr. Kresse, but rather, by Mr. Snow: **a former Brenner's supervisor with no interest in this case**.[3]

3.   Plaintiff admitted in his deposition that he had no evidence connecting Mr. Snow to Mr. Kresse's sexual harassment complaint.[4]  Yet, in direct contradiction to this testimony, he submitted a declaration with his Response, averring that Mr. Snow knew of the complaint and, thereafter terminated him as a result thereof.[5]  Plaintiff qualified this statement with an assertion that Mr. Snow treated him differently after the complaint.[6]  Mr. Snow's deposition clearly shows that Plaintiff's subjective belief about Mr. Snow's alleged awareness of the complaint is unequivocally flawed:

> Q.   At any time while you were working at Brenner's did Mr. Kresse tell you to treat Dave Thomas differently?
>
> A.   No, sir.
> . . .
>
> Q.   Do you have any knowledge of Dave Thomas complaining to anybody about the fact that Mr. Kresse had touched Dave Thomas in an inappropriate manner?
>
> A.   No, sir.
>
> Q.   Were you - - you weren't aware while you were working there that Mr. Thomas filed a complaint with the HR department?
>
> A.   No, sir.
>
> Q.   So Mr. Kresse didn't discuss that with you?

---

[3] *See* Snow Deposition, pgs. 43 & 82, Exhibit "A."  Mr. Snow testified that he no longer worked for any of the Defendants. *Id.* at pg. 43.  He is not hoping to go back to work for Defendants. *Id.* at 82.
[4] *See* Thomas Deposition, pgs. 194-95, attached to Defendants' Motion for Final Judgment as Exhibit "A."
[5] *See* Thomas Decl., ¶¶ 9-11, attached to Defendants' Reply to Plaintiff's Response to Defendants' Final Motion for Summary Judgment as Exhibit "A."
[6] *See id.*

A.      No.[7]

4.      In fact, on cross examination, Mr. Snow stated that the first time he learned of Plaintiff's alleged complaint was the day of the deposition: **more than two years after Plaintiff's termination**:

> Q.      Did he tell you that Dave Thomas had also complained that Mr. Kresse had sexually harassed him?
>
> A.      No.
>
> **Q.      Is this the first time you've ever heard that, I mean, just –**
>
> **A.      About Dave Thomas, yeah.**
>
> Q.      All right.  Did the company – did anybody from Landry's or Brenner's ever come to you while you were working at Brenner's and aks you if you had received any complaints about Mr. Kresse?
>
> A.      No.
>
> Q.      So if there was any investigation into Mr. Thomas's or Mr. Russ's complaints of sexual harassment, nobody from Landry's or Brenner's ever talked to you about it?
>
> A.      That is correct.[8]

5.      Thus, it is axiomatic that Plaintiff's belief that Mr. Snow was aware of the alleged "protected activity" in question amounts to no evidence. *See Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434 (5th Cir. 1995) (holding that subject belief of retaliation does not constitute evidence of a causal link for purposes of retaliation).  Likewise, this also shows that Plaintiff's declaration testimony stating that Mr. Snow treated him different after the complaint also

---

[7] *See* Snow Deposition, pgs. 32-33, Exhibit "A."
[8] *See id.* pg. 69-70.

constitutes incompetent summary judgment evidence.[9]   Mr. Snow's testimony bolsters this conclusion:

> Q.    All right.  Let me represent to you that Mr. Thomas has testified in the case that he felt like you started treating him differently after he complained to Mr. Kresse about - - or he complained about Mr. Kresse touching him in an inappropriate manner.  Were you aware of that?
>
> A.    No, sir.
>
> Q.    Did you treat Dave Thomas differently in any way at any time?
>
> A.    No.[10]

In point of fact, Mr. Snow took every effort to accommodate Mr. Thomas' unreasonable scheduling demands throughout his employment at Brenner's.[11]

6.    Consequently, Plaintiff put forth no competent evidence, other than his own subjective belief, that the supervisor responsible for terminating him was aware of the sexual harassment complaint.  *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 & n.6 (5th Cir. 2003) (citing *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) and *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999)); *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 604 (5th Cir. 2001) (holding in First-Amendment retaliation case that, "[i]f there is no evidence that the [decision maker] knew of the protected activity, [the plaintiff] cannot show that the activity motivated retaliatory behavior").  This entitles Defendants to summary judgment on Plaintiff's retaliation claim.

---

[9] *See* Thomas Decl., ¶¶ 9-11, attached to Defendants' Reply to Plaintiff's Response to Defendants' Final Motion for Summary Judgment as Exhibit "A."
[10] *See* Snow Deposition, pgs. 33-34, Exhibit "A."
[11] *See id.*, pgs. 9 & 22.

7.      Plaintiff also contended in his Response that Defendants' patently legitimate reasons for terminating Plaintiff constitute pretext.[12]  Mr. Snow's testimony directly refutes the validity of this contention.  First, Mr. Snow testified at length regarding Plaintiff's repeated attendance violations.[13]  He also testified regarding Plaintiff's employment with Brenner's: he was a lousy and an irresponsible employee.[14]  He pointed out that on the day in question Plaintiff was not only late, but he was not prepared even to work.[15]  Second, and more importantly, Snow testified of the principal reason for which Plaintiff was terminated: screaming profanities at his immediate supervisor:

> A.      . . . And I turned to go back in the dining room and I heard him under his breath, but loud enough for me to hear it, say, **"you fucking idiot."**  And I turned around and I said, "excuse me?  What did you say?"  He said, **"I told you you're a fucking idiot."**  And I told him that he was then terminated and he could leave the building immediately, and I was going to watch him leave.  **And then he started to flip me off, shoot the bird, give me the finger, whatever you want to call it, continue to call me a fucking fat ass.**  And I just – at that point I was just saying, "Thank you very much, just please leave the building."[16] . . .
>
> Q.      Did you follow him out or do anything else?
>
> A.      Yes.  I wanted to make sure he left the building.  I wanted to make sure the door was locked as he left.  And I – and Chef Phil Daleo walked with me at this point.  And I just tried to maintain my composure, and I just said, "Thank you very much.  Thank you, Dave.  Thank you."  **And he continued to flip me off.  He got in his car, continued to flip me off.  He was flipping me off from the feeder of I-10 as he left the property."[17]

---

[12] *See* Plaintiff's Response to Defendants' Motion for Final Summary Judgment, pg. 13.

[13] *See* Snow Deposition, pgs. 9-10, 18, & 41, Exhibit "A."

[14] *Id.* pgs. 35 & 70.  Mr. Snow testified as follows regarding Plaintiff:

> He was – I would – the word that comes to mind is lousy.  I'm trying to be a little more – he was not – not untrustworthy, but he was irresponsible.  He was not – he was not a good employee.  He was not punctual.  You couldn't trust him to show up for his shifts.  I would jut call him – just not a very responsible employee. *Id.* at 35.

[15] *See id.* pgs. 9-10.

[16] *See id*, pg. 12, Exhibit "B."  Mr. Snow indicated in his deposition that he did not have the authority to terminate Plaintiff.  However, Mr. Snow was merely referring to the fact that he did not have authority to perform the ministerial task of signing the final paperwork.  *See id.* pg. 13.  Mr. Snow's ability to terminate Plaintiff was acknowledged by Plaintiff's own deposition testimony.  *See* Thomas Deposition, pgs. 91-93.

[17] *See id.*  Mr. Snow estimated that Plaintiff called him the "F" word at least a dozen times. *Id.* pg. 60.

8.      Plaintiff also argued in his Response that Mr. Snow acted as an unreasonable manager by terminating Plaintiff.[18]  Apart from the fact that it is irrelevant whether Mr. Snow acted reasonably in his decision,[19] the undisputable facts surrounding Plaintiff's do not support this contention.   In fact, the reasonableness of Mr. Snow's actions are supported by his deposition testimony in which he testified that if Mr. Snow had simply gone home when he was instructed to leave, he would not have been terminated.[20]  Rather, Mr. Snow merely would have written him up.[21]

9.      In sum, Plaintiff's declaration that Mr. Snow was aware of his sexual harassment complaint is incompetent summary judgment evidence.   Mr. Snow's deposition testimony demonstrates that Mr. Snow did not know of Plaintiff's complaint at the time of his termination. Consequently, Mr. Snow could not have treated Plaintiff any differently after the complaint.  In fact, Mr. Snow worked to aid the Plaintiff with his scheduling needs.  Mr. Snow's testimony also underscores the egregious nature of the conduct resulting in his termination.   Defendants' decision to terminate as a result thereof was not only legitimate but, in fact irrefutably appropriate.   As a result, Summary judgment is proper, and Defendants' motion should be granted.[22]

---

[18] *See* Plaintiff's Response to Defendants' Motion for Final Summary Judgment, pg. 15.
[19] Texas' has long adhered to the employment "at will" doctrine.  *Spuler v. Pickar*, 958 F.2d 103 (5th Cir. 1992); *East Line & Red River Ry. Co. v. Scott*, 10 S.W. 99 (Tex. 1988); *Wornick Co. v. Casas*, 856 S.W.2d 732, 735 (Tex. 1993); *see also  Crenshaw v. Gen. Dynamics Co.*, 940 F.2d 125 (5th Cir. 1991); *White v. FCI USA, Inc.*, 319 F.3d 672, 676 (5th Cir. 2003); *Spuler v. Pickar*, 958 F.2d 103, 106 (5th Cir. 1992); *Crenshaw v. Gen. Dynamics Corp.*, 940 F.2d 125, 128 (5th Cir. 1991).   Therefore, it is completely irrelevant whether Plaintiff believes that Mr. Snow acted unreasonably by terminating him.
[20] *See id.* pgs. 26 & 27. ⟩ Full Cite
[21] *See id.*
[22] Defendants' summary judgment order is attached to their original motion.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID THOMAS,                    )
            Plaintiff,           )
                                 )
vs.                              )   C.A. NO. H-04-4479
                                 )
WILLIE G'S POST OAK, INC. and    )
LANDRY'S RESTAURANTS, INC.       )
            Defendants.          )


************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
STUART SNOW
FEBRUARY 22, 2006

************************************************


        ORAL AND VIDEOTAPED DEPOSITION of STUART SNOW,

produced as a witness at the instance of the Defendants,

and duly sworn, was taken in the above-styled and

numbered cause on FEBRUARY 22, 2006, from 11:07 a.m. to

12:52 p.m., before Cynthia L. Hargrave, CSR in and for

the State of Texas, reported by machine shorthand, at the

offices of Sheehy, Serpe & Ware, P.C., 2500 Two Houston

Center, 909 Fannin Street, Houston, Texas, 77010,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

NEW   CENTURY   REPORTING
(713)   626-0170

**EXHIBIT**

A

50bb1c6b-

STUART  SNOW  -  February 2ᴄ, 2006

Page 2

1          A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
        Mr. G. Scott Fiddler
4       LAW OFFICES OF G. SCOTT FIDDLER, P.C.
        13831 Northwest Freeway, Suite 510
5       Houston, Texas  77040
            Telephone: 713.661.1146
6           Facsimile: 713.462.7998
7
   FOR THE DEFENDANTS:
8       Mr. Howard T. Dulmage
        SHEEHY, SERPE & WARE, P.C.
9       2500 Two Houston Center
        909 Fannin Street
10      Houston, Texas  77010-1003
            Telephone: 713.951.1000
11          Facsimile: 713.951.1199
            Email: HDulmage@SSWPC.COM
12
13 THE REPORTER:
        Cynthia L. Hargrave, CSR/RPR
14      NEW CENTURY REPORTING
        4545 Post Oak Place, Suite 350
15      Houston, Texas  77027
            Telephone: 713.626.0170
16          Facsimile: 713.626.1966
            E-mail: newcentury@houston.rr.com
17          www.newcenturyreporting.com
18
   VIDEOGRAPHER:
19      Mr. Gregory A. Zajac, LVS
        Axon Video Consulting
20      11647 Pebble Sands Dr.
        Tomball, Texas  77375
21          Telephone: 713.291.1196
22
23
24
25

NEW  CENTURY  REPORTING
(713)  626-0170

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 2-, 2006

Page 9

1    with you and Dave Thomas?

2         A.    He was a server, I was his manager.  And the

3    only situation that I remember -- there was a couple of

4    them.  He was kind of hard to schedule in that he --

5    while he was working at Brenner's I tried to keep

6    everyone sort of on a permanent schedule, made it easier

7    for everyone to -- to line up their days and their weeks

8    and know how they were working.  And at one point Dave

9    came to me and said, "I have a job somewhere else.  I can

10   only work days."  And then later on it became, "I can

11   only work nights."  And then there was a combination.

12   There was a lot of confusion as to when he could work.

13   And I tried to adhere to his schedule requests, but

14   sometimes he would make schedule requests after schedules

15   had already been posted to accommodate his own schedule.

16   And, anyway, it was a bit of a problem scheduling him.

17                    And then there was the -- the day that

18   he -- he and I were in the kitchen and he had come to

19   work late, and I told him I didn't need him that day.  He

20   came to work unprepared.  When you come to work at

21   Brenner's, you're supposed to be able to walk in the door

22   with your uniform on, ready to work.  And he was casually

23   strolling through the kitchen, talking to the kitchen

24   crew, his tie wasn't on, his apron wasn't on, his shirt

25   wasn't buttoned, he was clearly not prepared to work, and

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 22, 2006

Page 10

1    he was late, and I told him to go home, that I didn't

2    need him to work that day.  And --

3         Q.   Well, let me just ask you some more questions.

4    So let's go back to the schedule request, and then we'll

5    come back to the --

6         A.   Okay.

7         Q.   -- to the second incident you described.

8              Were you -- was it your job to schedule

9    the wait staff --

10        A.   Correct.

11        Q.   -- while you were working as the service

12   manager?

13        A.   Correct.

14        Q.   Did Mr. Kresse get involved in -- in scheduling

15   the staff?

16        A.   No.

17        Q.   Did he ever tell you, "Don't schedule this

18   guy," or, "Do schedule this guy"?

19        A.   No.

20        Q.   Did -- specifically did he ever tell you to

21   adjust Dave Thomas's schedule in any way?

22        A.   Not that -- not that I remember.

23        Q.   Okay.  Now, the day that you talked about where

24   Mr. Thomas came in and was, as you just described a few

25   seconds ago, not fully in his uniform and ready to go,

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 22, 2006

Page 12

1      Q.    Did -- you know -- and I only ask you this

2  because you just testified to it.  Are -- are you

3  weightwise the same weight you were at the time?

4      A.    I think so.  Around that.  I'm -- uh-huh.

5      Q.    Yeah.  And did he say anything else to you?

6      A.    No.  He just continued to flip me off and use

7  the "F" word.  And just continued to be, you know,

8  verbally abusive.

9      Q.    Did you follow him out or do anything else?

10     A.    Yes.  I wanted to make sure he left the

11 building, I wanted to make sure the door was locked as he

12 left.  And I -- and Chef Phil Daleo walked with me at

13 this point.  And I just tried to maintain my composure,

14 and I just said, "Thank you very much.  Thank you, Dave.

15 Thank you."  And he continued to flip me off.  He got in

16 his car, continued to flip me off.  He was flipping me

17 off from the feeder of I-10 as he left the property.

18     Q.    Did you have the authority to terminate?

19     A.    No.  However --

20     Q.    Go ahead.

21     A.    I do know that the -- the ground that I'm

22 standing on when an employee accosts you and says, "Fuck

23 you, you're a fucking fat ass," that's termination.  And

24 I just told him -- that's why I said, "Yeah, you're

25 fired."

NEW   CENTURY   REPORTING
(713)   626-0170

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 22, 2006

Page 13

1      Q.   But you didn't make the actual final

2    decision --

3              MR. FIDDLER:  Objection.  Form.

4      A.   No, sir.

5      Q.   You didn't make the actual final decision?

6              MR. FIDDLER:  Objection.  Form.

7      A.   No, I didn't.  That -- that was Eric Kresse, I

8    think, did the final termination papers.

9      Q.   Okay.  Did you -- did Brenner's at the time

10   have any kind of video cameras, security video cameras?

11     A.   Yes, we did.  Out the back door.  There was no

12   audio associated with it, but there was a -- there was a

13   camera on the back loading dock, there was cameras

14   throughout the kitchen.  A couple of them, I think.

15     Q.   Did you have any occasion to review the video

16   of the incident between you and Mr. Thomas?

17     A.   No.

18     Q.   Do you know if Brenner's retains those tapes

19   for any specific length of time?

20     A.   I don't -- we never, ever looked at any tapes.

21   I don't even know that the tape machine worked.

22     Q.   So you don't know anything about the tapes, one

23   way or the other with those tapes?

24     A.   No.

25     Q.   All right.  Did Dave Thomas at any time say

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 22, 2006

1      A.    Correct.

2      Q.    All right.  Do you remember the circumstances

3  that caused you to fill out this document?

4      A.    Pretty much self-explanatory.  He was scheduled

5  to be an on-call server, and that's a -- just like a

6  shift that you're supposed to show up for, except you're

7  supposed to call, as it explains in this document, 15

8  minutes after the last scheduled server's to be on the

9  floor.  That's because of business fluctuation.  If we

10 need an extra server, that server is prepared to come in.

11     Q.    Okay.  And does this warning mean that he's

12 necessarily going to be terminated, or is this just a

13 document the person didn't do what they're supposed to

14 do?

15     A.    Well, as you can see, there's four categories

16 at the top:  First warning, second warning, suspension,

17 termination.

18     Q.    But -- I mean, it's not to say that the next

19 one would necessarily be suspension, is it?  I mean, does

20 the manager have a little bit of discretion?

21     A.    Yes.

22     Q.    All right.  But this is just a method to

23 document the --

24     A.    Correct.

25     Q.    -- policy violation?

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART  SNOW  -  February 2<, 2006

Page 22

1  April 19th, 2001.  I was a service manager at Brenner's

2  from May 11, 2003, through December 8, 2003."  Did I read

3  that correctly?

4       A.    Uh-huh.

5             MR. FIDDLER:  Yes?

6       A.    Yes.

7       Q.    And does that sound correct to you?  I mean, do

8  you question that now, as you sit here today?

9       A.    Yes, that sounds correct.

10      Q.    Okay.  All right.  Why don't you read to us the

11  next paragraph and then we'll -- I'll ask you a couple of

12  questions about it.

13      A.    "I was the manager responsible for writing the

14  work schedules for the servers while I worked at

15  Brenner's.  During that time Dave Thomas made several

16  requests to change his schedule, even after schedules had

17  been posted for all servers to see and plan by.  I made

18  every attempt to work with Mr. Thomas or to accommodate

19  his many requests, but was not always able to do so.

20  Mr. Thomas often changed the times he said he was

21  available to work.  These frequent changes made

22  scheduling him very difficult and eventually led to

23  enough confusion that a mistake was made and he was left

24  off the schedule."

25      Q.    All right.  Now, you just read "made," but it

NEW  CENTURY  REPORTING
(713)  626-0170

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 22, 2006

Page 26

1        Q.   All right.   Just the same question.   Is there

2   anything in that fourth paragraph that as you sit here

3   today you remember differently?

4        A.   No.

5        Q.   All right.   Now, from reading the fourth

6   paragraph, it sounds like the sequence of events was that

7   first you told Mr. Thomas to go home, and then the

8   situation escalated and then you told him he was fired.

9   Is -- is that correct?

10        A.   Correct.

11        Q.   All right.   Did -- initially was it your intent

12   to fire Mr. Thomas for being late?

13        A.   No.

14        Q.   What would have happened to Mr. Thomas if he

15   had just gone home like you had asked him?

16              MR. FIDDLER:   Objection.   Form.

17        A.   He would have been written up for being late.

18   And probably that would have been it.

19        Q.   (BY MR. DULMAGE)   All right.   Let me reask that

20   question since counsel's objected.

21              As far as you would have been concerned,

22   as his service manager, what would you have done to

23   Mr. Thomas if he had just left the building like you

24   asked him to?

25        A.   I would have --

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

Page 27

1          MR. FIDDLER:  Objection.  Form.

2      A.   I would have documented the incident on a dis--

3   disciplinary action report, and that would probably have

4   been the extent of the -- the disciplinary action.

5      Q.   And when you told Mr. Thomas that he was

6   fired -- you know, I think there's some controversy in

7   the case whether, you know, you told him he was fired

8   right away or whether you told him he was fired after

9   he -- he started yelling at you, in effect, or saying

10  some things to you.  Regardless of whether this statement

11  is, you know, exactly correct or not, as you sit here

12  today -- what? -- two -- two years past the incident, two

13  years past the incident, did you tell Mr. Thomas right

14  away that he was fired?

15      A.   No.

16      Q.   Okay.  When did you tell him he was fired?

17      A.   After he called me a fucking idiot and a

18  fucking fat ass.

19      Q.   All right.  So that was the -- that was the

20  cincher for you?

21          MR. FIDDLER:  Objection.  Form.

22      A.   It would be impossible to work with an employee

23  who had accosted me in that manner.

24      Q.   And when you say "impossible to work," what do

25  you mean, sir?

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 2⌂, 2006

Page 32

1      A.    No.

2      Q.    All right.  And I want to make it clear for the

3   record.  You asked us to send you whatever documents we

4   thought were going to come up in your deposition, didn't

5   you?

6      A.    Correct.

7      Q.    Okay.  We didn't offer to do it, did we?

8      A.    No, sir.

9      Q.    All right.  Now, is this the type of form that

10  you saw while you were working as a service manager at

11  Landry's?

12     A.    Yes.

13     Q.    All right.  And what is this form?

14     A.    It's a personnel -- personnel action record.

15     Q.    All right.  And Brenner's used this form also?

16     A.    Yes.  Uh-huh.

17     Q.    All right.  At any time while you were working

18  at Landry's -- I'm sorry, strike that.

19            At any time while you were working at

20  Brenner's, did Mr. Kresse tell you to treat Dave Thomas

21  differently?

22     A.    No, sir.

23     Q.    Do you have any recollection of -- well, let me

24  back up.

25            Do you have any knowledge of Dave Thomas

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 22, 2006

1    complaining to anybody about the fact that Mr. Kresse had

2    touched Dave Thomas in an inappropriate manner?

3        A.   No, sir.

4        Q.   Were you -- you weren't aware while you were

5    working there that Mr. Thomas had filed a complaint with

6    the HR department?

7        A.   No, sir.

8        Q.   So Mr. Kresse didn't discuss that with you?

9        A.   No.

10                MR. FIDDLER:  Objection.  Form.  Leading.

11       Q.   Well, let me just reask it the other way.  Did

12   Mr. Kresse discuss that with you?

13       A.   No.

14       Q.   Mr. Thomas has testified in this case -- well,

15   let me ask you this.  Have I sent you or has anybody else

16   sent you Mr. Thomas's deposition in this case?

17       A.   No.

18       Q.   So you don't know what he's testified to one

19   way or the other?

20       A.   No, sir.

21       Q.   All right.  Let me represent to you that

22   Mr. Thomas has testified in the case that he felt like

23   you started treating him differently after he complained

24   to Mr. Kresse about -- or he complained about Mr. Kresse

25   touching him in an inappropriate manner.  Were you aware

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 22, 2006

Page 34

1    of that?

2                    MR. FIDDLER:   No, sir.

3        Q.    Did you treat Dave Thomas differently in any

4    way at any time?

5        A.    No.

6        Q.    Okay.  Were you aware that Mr. Thomas had

7    missed some other work shifts?

8        A.    If he had missed them, I'm sure I was aware of

9    them.

10       Q.    All right.

11       A.    I don't recall, but I'm sure I was aware if he

12   missed them.

13       Q.    Right.  Well, you didn't ask us to send you his

14   complete employee file, so you -- you haven't looked at

15   every document that's in his employee file, have you?

16       A.    No.

17       Q.    All right.  So if there was other documents in

18   his employee file that maybe some of the other managers

19   had signed or some -- somebody else had signed in the

20   company, would you have had occasion to look at those in

21   your job duties at -- at Brenner's?

22       A.    I didn't make it a practice to dig through

23   everybody's files.  If it -- it was something that I

24   filled out, it would go in his file, but I didn't -- no,

25   I wasn't aware -- I mean, I didn't -- no, I didn't.

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 22, 2006

Page 35

1       Q.    All right.   Is -- is -- what kind of employee

2    was Dave Thomas, in your opinion?

3       A.    He was -- I would -- the word that comes to

4    mind is lousy.   I'm trying to be a little more -- he was

5    not -- not untrustworthy, but he was irresponsible.   He

6    was not -- he was not a good employee.   He was not

7    punctual.   You couldn't trust him to show up for his

8    shifts.   I would just call him -- just not a very

9    responsible employee.

10      Q.    Did you have any complaints about him that you

11   recall from any of the other staff?

12      A.    Yes.

13      Q.    What kind of complaints?

14      A.    That he was late, that he didn't do his share

15   of side work, that he was basically selfish on the floor,

16   wouldn't help other people.   They just didn't like to

17   work with him.

18      Q.    And the jury may not know what side work is.

19   Would you explain to them what side work is?

20      A.    Side work are things waiters do before and

21   after the shift to prepare the dining room for the next

22   shift.   That includes polishing silverware, filling salt

23   and pepper shakers.   Then there's small things in the

24   kitchen such as setting up a cream station or folding

25   linen.   And I -- I had heard the servers chatter that

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART  SNOW  -  February 22, 2006

Page 41

1    to you as his superior other than the one incident that
2    we've talked about?
3         A.    Not anything close to that, no.
4         Q.    Did you ever have to counsel Mr. Thomas about
5    some of the problems that you've testified so far about
6    that -- that you had with him or that the restaurant had
7    with him?
8         A.    Well, when Dave was tardy, and there was a lot
9    more times he was tardy than we ever had write-ups, I
10   would say to him, you know -- you know, "Try to show up
11   on time, be here on time."  That means walking in the
12   door at -- and these were friendly meetings.  These were
13   like, you know, "Come on, let's get your act together,
14   this is a good job, you want to work here."  And after a
15   couple of those, you know, just kind of friendly
16   reminders, yes, I counseled Dave -- David several times
17   on showing up on time, and then when he just kind of blew
18   that off, it was write-up time.
19        Q.    So as you sit here today, your recollection is
20   that Dave Thomas was tardy more times than you remember
21   him being written up for?
22        A.    Absolutely.
23        Q.    And were other employees tardy?
24        A.    No.
25        Q.    Nobody else was ever tardy?

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 22, 2006

Page 43

1    Q.    Did you get a chance to meet Sebastiano

2  Mazzucato?

3    A.    No.

4    Q.    Do you know, based on working with Sebastiano,

5  what his managerial experience was in the restaurant

6  business?

7    A.    I know he had a background in restaurant

8  management.  I'm not sure exactly what it was.

9    Q.    Any crit-- criticisms of Sebastiano as a -- as

10  a manager, as you sit here today?

11    A.    No.

12    Q.    Any criticisms of Mr. Kresse?

13    A.    No.

14    Q.    Now, you don't currently work for Landry's or

15  any of its affiliates, do you?

16    A.    No.

17    Q.    All right.  Would you go back to work for

18  Landry's?

19    A.    It would just depend on their offer.

20    Q.    All right.  And you weren't -- were you

21  terminated?

22    A.    No.

23    Q.    Did you leave on your own?

24    A.    Yes.

25    Q.    Why did you leave?

STUART   SNOW   -   February 22, 2006

Page 69

1      Q.    Did he tell you he was guilty as charged?

2      A.    No.

3                  MR. DULMAGE:  Objection.  Form.

4      A.    We can go.

5      Q.    What else did he say about it?

6      A.    Not much.  Just that he had been accused of it

7  and that was it.

8      Q.    What did he say about John Russ?

9      A.    Nothing.

10     Q.    Did he tell you that -- I'm sorry?

11     A.    No.  Just that he was -- had brought a -- had

12  brought a lawsuit about it and -- and that was it.

13     Q.    Did he tell you that Dave Thomas had also

14  complained that Mr. Kresse had sexually harassed him?

15     A.    No.

16     Q.    Is this the first time you've ever heard that,

17  I mean, just --

18     A.    About Dave Thomas, yeah.

19     Q.    All right.  Did the company -- did anybody from

20  Landry's or Brenner's ever come to you while you were

21  working at Brenner's and ask you if you had received any

22  complaints about Mr. Kresse?

23     A.    No.

24     Q.    So if there was any investigation into

25  Mr. Thomas's or Mr. Russ's complaints of sexual

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 22, 2006

Page 70

1  harassment, nobody from Landry's or Brenner's ever talked
2  to you about it?
3      A.    That is correct.
4      Q.    You were the direct supervisor of Mr. Thomas
5  and Mr. Russ?
6      A.    Correct.
7      Q.    And Mr. Kresse's direct subordinate?
8      A.    Right.
9      Q.    I think you said you thought Dave Thomas was
10  lousy; is that right?  A lousy waiter or -- did you mean
11  a lousy person?
12      A.    Just his work habits were not good.  He was
13  unreliable.  Like I said, you know, when somebody's late
14  or tardy or doesn't come to work prepared, you don't --
15  they weren't written up every time -- he wasn't written
16  up every time, because you want to cut them some slack,
17  find out what their issues are, et cetera.  But when it
18  becomes habitual, you just -- you know, you have to start
19  writing people up.
20          MR. FIDDLER:  Objection.  Nonresponsive.
21      Q.    (BY MR. FIDDLER)  My question was whether you
22  had testified that Mr. Thomas was lousy.
23      A.    I did, yes.
24      Q.    Okay.  Tell me something good about Mr. Thomas.
25      A.    He quit once.  That's the best thing I can say

NEW   CENTURY   REPORTING
(713)   626-0170

50bb1c6b-9306-4690-b9fa-ba7cb7b48cbf

STUART   SNOW   -   February 2⌐, 2006

Page 82

1    Q.   So if an employee is a good employee, then they

2    don't worry about whether they're gay or not gay?

3              MR. FIDDLER:  Objection.  Form.

4    Q.   (BY MR. DULMAGE)  Is that a fair statement?

5    A.   I think that's a fair statement.

6    Q.   Are you hoping to some day go back to work for

7    Landry's or any of its affiliates?

8    A.   No.

9              MR. DULMAGE:  Pass the witness.

10             FURTHER EXAMINATION

11   BY MR. FIDDLER:

12   Q.   You're aware that Mr. Kresse's a homosexual,

13   aren't you?

14   A.   No.

15             MR. DULMAGE:  Objection.  Form.

16   Q.   You don't know that one way or the other?

17   A.   No.

18   Q.   Has he ever said anything to you that indicated

19   that to you?

20   A.   No.

21   Q.   Has he ever talked to you about sexual matters?

22   A.   No.

23   Q.   Did Eric Kresse ever express any

24   dissatisfaction with Dave Thomas prior to his

25   termination?